1084, Zeno Petelik v. E.B. Commercial, Inc. v. Brittany Plank, P.M. May it please the court, counsels, David Barish for the appellant, Zeno Kowalicz. At root, this is a case of the mundane manual tax, which is clearly the province of the Is that mundane? Is that mundane? The weighing of facts? Is that a mundane task? When we get to this level, to some extent, it is. At the commission level, it's vital. I don't mean to demean that task, which is a vital task. And I agree that the commission may weigh the facts. And perhaps you may ask, well, counsel, why are you here? And the reason why I'm here is the issue central to this case is which facts may the commission weigh? Which, quote, facts may the commission not weigh? And here to this, are there certain assumptions that were proclaimed as facts? It is our position that cell phone tower location data may not be relied upon by the commission or any other trial of a fact. But when you introduced it, they didn't. And it went in without objection. That is correct, Your Honor. So why can't they, if you didn't want them to consider it, why haven't they introduced it? Because that is an evidential issue. We have no quorum that we introduce that. If we introduce medical records, Your Honor, and they show that my client has arthritis in his hand, that does not mean that my esteemed opponents are entitled to argue or that the commission is entitled to find that my client has a preexisting condition and his condition is no longer related. Absent expert testimony, absent an opinion from a doctor saying that that arthritis is preexistent and that arthritis may be a walking time bomb and it was in a fractured wrist anyway. Yes. Well, the magnitude, I might agree with you as to the magnitude. I don't agree with you as to the existence of the condition. Medical records may establish the existence of the condition of arthritis. It may not establish what the magnitude of it is. In this particular case, the only thing the commission used was to establish that the pains coming from these towers from your client's phone didn't correlate with the times that he claimed he was hurt. If you take it, Your Honor, to that level, to say that the pains came from those towers, I have no quorum whatsoever. My quorum is with saying because of those pains, we can find that Mr. Pehovich could not have been in Brittany Place. Do you make that objection? Yes. Try. Your Honor, no, and I will explain why. The gall, the audacity, the incredulity of that assumption wasn't made until they wrote their proposed findings. Witnesses were asked about the interpretation of that record, about the origination and destination of the law. To be honest, I don't recall whether I objected to that or not. But the reality is... If you didn't object, assuming that, haven't you forfeited the issue? Had I not objected, frankly, I don't recall. All I recall is fighting that issue from the minute it was ever even encountered. Because, yes, pains came from these various cell towers. But to say that those pains then placed my client in a certain location or placed a criminal defendant in the cases that we saw, absent expert evidence that explained how those things work... Counsel, the cell tower evidence is not the only reason why the commission didn't find your client credible. First of all, he claimed that he was told to go do something with the boilers. He didn't do anything with the boilers. There was nothing in the log that said he did. He did it the day before. In response, Your Honor, that is untruthful. It is? He never said he was going to check the boilers. He said he was told to go check the boilers. He was told to check heating in the common areas of the building, which is why this whole boiler check nonsense isn't what the case is about. There's no question he had done his regular checks in the boilers. The building was to be closed, or nobody was going to be in the office over the Christmas holiday, and he was asked to check the heat in the common areas. Isn't there heat in all ways? A very reasonable thing for them to check on it. And so Mr. Bravo tried to check on it. Now, there is no question that Mr. Walchek denies ever giving that order, and I understand that. So if we set aside this cell phone issue, let's look at what is the evidence in this case. I have a disinterested witness who places Mr. Brinkovich holding his hand in pain shortly after the call from the town and shortly after he says he was hurt in the parking lot of Brinkley Place. Loosely disinterested witness? Loosely disinterested witness. Loosely. The arbitrator found... Probably the same arbitrator from the first case. Let's talk about this. So should we take judicial notice of the arbitrators now? Is that what we're going to do? I think you're making... Proper comment, I withdraw that. This disinterested witness is a real estate agent who had lived in the building and knew the maintenance man. That's a friend? There is no relationship? Yes, Mr. Brinkovich, I can't remember. One of them called the other to wish her Merry Christmas earlier in the day. She sees him in the parking lot. So I've got a disinterested witness placing him in the parking lot of Brinkley Place holding his hand. I have a hospital record within hours of the incident with a man complaining of an injury to his hand saying he fell at work. And I have a man who already knows that his uninsured boss is going to question him and is begging him, please give me an alcohol test so I can show you that I'm not drunk. And then I have a cell phone call right along the top of the cell phone from Mr. Brinkovich to Ms. Davis, his boss, using graphic language, saying he fell, he feels bad about it, he's sorry, he's going to the hospital. So I have all the elements where I walk in across the street and say, I have a dead banger. So the show that my opponents put on to try and show some color, essentially they have two witnesses. They have Ms. Aders, who says, I told you to go home early. And you know what his response is? That's exactly what she told me. She told me I had to go home early, but I had work to do so I didn't do it. And we have Mr. Walchek, there's no question. There is a conflict between Mr. Walchek and Mr. Bohovich, and the commission is entitled to rely upon that. But even looking at that conflict, the reality is I've placed Mr. Bohovich at his place of work. And once we do what the circuit court did, which was appropriate in eliminating this cell phone data. Once you eliminate that, you still have an unwitnessed fall. I understand, notwithstanding the disinterested witness nature, that wasn't a witness that witnessed the fall. So you have an unwitnessed fall that comes down to credibility of the claimant. I guess the question I have is this. If you eliminate the cell phone data, then there's no question that way ahead in the argument. But let's assume, as you say, we're dancing around that you eliminate that. You still have a fundamental credibility issue because it is the commission's job, as you well know, to weigh the credibility of the witnesses, the weight to be given to the testimony. They felt that your claimant's inconsistent history undermined the veracity of his testimony. What do we do with credibility? Go with your version or what the commission finds? Your Honor, I would like to read a quote from the arbitrator's decision at page 15 that may help answer your question. The arbitrator wrote at page 15, Ms. Litocha's testimony, however, is inconsistent with Petitioner's cell phone records, which indicates that Petitioner was not at Brittany Place after 2.37 p.m. As such, Ms. Litocha's testimony lacks credibility and does not confirm that Petitioner's accident occurred at the time and place alleged by Petitioner. And the reason why I bring that quote to this panel is because it is clear that every piece of evidence was weighed by the arbitrator and the commission through the lens of cell phone data. Take it easy, will you? Your client testified that this whole thing happened at 3 o'clock. Did he not? Yes. You hear what he said? The cell phone data showed that he placed the call at 2.37 p.m. that originated in Arlington Heights. 2.38 p.m. the phone, the origination came from Mount Prospect. 2.40 p.m. the planes, and 3.11 p.m. originating in Glenview. How can he be in all these places and still be in Arlington Heights at 3 o'clock? If the cell phone evidence is allowed into evidence, you are absolutely correct. And this panel should affirm the decision and deny my client that. But counsel, the point of the matter is, it is in evidence and you put it there. The pings are in evidence. The assumption that my client is also in Arlington Heights, Mount Prospect, the planes in Glenview, that assumption is not in evidence. The pings are in evidence. Absent an expert, you cannot extrapolate with all due respect that my client is in a certain location based on cell phone-powered data. And if you read the cases that I cited, there was a detective, Officer Rash, who apparently must be an expert at this stuff, because he's cited in the FOPM case, and he's also cited in the federal case that I cited, U.S. v. Evans, which I understand is not cited in any way in this court, but it was interesting to me. The same detective, Officer Rash, he testified in both Clay's cases. And in both cases, because there was expert testimony, no fried hearing was required, because he was able to explain and extrapolate from the pings to the opinion that the defendant in those cases, or my client in this case, was either at or not at a certain place. There is no detective Rash in this case. I put in those records to show the times of the phone calls. And if you want to say, well, counsel, if that's the way you want it, we're not going to look at the times of the phone calls. So be it. But the reality is... Wait a minute, wait a minute. Hold on a second. You don't get another do-over here. I'm not asking. You put it in. No question. We're not going to ignore it. The commission didn't ignore it. It's there. Absolutely. And I offer the evidence, and there's no question about the evidentiary issue. A great portion of everybody else's brief. But the irony is, I have no quarrel with it. Yes, I introduced the exhibit. But the question is, what do you do with it? Let me see if I can help you out here, because we're dancing around the issue. I think I understand your subtle points, okay? The records of the times is a little different than which cell tower the phone is pinging off of. I think I understand what you're saying is, somebody could be on the border of one municipality and another, and it could ping in a cell tower in Mount Prospect when he's in Arlington Heights or something like that. Is that what you're saying? It's not definitive what municipality he's in, because the nearest tower could be actually in another jurisdiction. Yes, Your Honor. I haven't gone up in the area. Towers are all very close to one another. Glenview isn't that close to Arlington Heights, counsel. Glenview is not that close to Arlington Heights. Glenview is the critical time, 3-11. That's a critical time. Because he claimed he was falling downstairs at 3 o'clock, laying there for 15 minutes, then going back to his office, staying at his office from 10 to 20 minutes. Where did 3-11 and Glenview come from? Understood, but then... You have some other credibility. Where does he go from 3-11 to approximately 4 o'clock when he's seen at Grittany Place by an eyewitness, who the only reason why she's deemed to be incredible is because she is inconsistent with the cell phone data. I had an eyewitness who, you know, in those cases that I cited and talked about, a detective rash and a strike, a battery and a cross-examination. Really, what did they put her up to, Ms. Wetosha? Let me interrupt you, because I want opposing counsel to address this same issue. In terms of the location relative to the cell phone records, did any witness testify to what the phone records meant as to origination and destination? Absolutely. Okay, so the only evidence in the record relative to origination and destination are the phone records themselves. And they basically are just in a chart or a log form with the words origination and then a municipality identified. And then destination and then a municipality identified. Is that right? That is correct, Your Honor. Okay. And to be clear, there was no other evidence indicating what those municipalities signified, whether it be that's where the cell phone tower was or that's where a cell phone user was physically located. Is that right? That is absolutely correct, Your Honor. All right. So it was the arbitrator that inferred, not through direct, did not conclude based on direct testimony, but inferred from this data log that origination meant that's where the cell phone caller was physically located. And destination was where the cell phone recipient, the recipient of the cell phone call, was physically located. Is that right? That is correct, Your Honor. Okay. Thank you. Okay, counsel, you'll have time to reply. Thank you. Counsel, you may respond. This question is asking for respondent or a rewritten place kind of a name association. Your Honor, it's a manifest way that the evidence does support the patient's decision. And even if we don't consider the cell phone records, that's the fact. Well, the summary that Justice Harris just gave, do you agree with that? Well, I will agree. And just to go back a little bit, the way in which that evidence was given to us was by counsel as an exhibit for trial. In different characterization, when you're in a criminal case and there's a warrant for the cell phone records and they get an expert to interpret it because someone said, well, liver disease is an issue. In this case, petitioner offered those records. Well, that doesn't really matter. I mean, I think that's a red herring for the most part. We're talking about an inference, an interpretation being made that would perhaps require some additional evidence from somewhere that would permit that inference interpretation to be reasonable. Well, Your Honor, the petitioner testified to those records. Rob Cross was shown the records and admitted that certain calls that appeared with the word lending next to them were made while he was driving to work. He testified to the path that he would take to work each day. The cell phone records, you know, infer he traveled away from Brittany Place during the day long before he claims he was injured to run an errand to his bank, and he admitted that that occurred. So in cross-examining him using the cell phone records and asking him if this is what that meant, it would appear that you're not accessing Elk Grove Village anymore, now Dust Plains, Niles, Morton Grove. Did you go to your bank for an errand at lunch? He admitted that he did. And so if you can't make a scientific inference, and I would submit that some of the cases, you know, away from that being a scientific analysis, but if we're going to assume that an expert was required to show that that actually also meant it, I'll submit to you the petitioner admitted it. Wait a minute. I'm looking at the graph. The graph says origination. It says destination. That was introduced by the petitioner. What type of interpretation do you need for the word origination, the word destination? I need none, Your Honor. I believe that it does show that the petitioner wasn't on the premises at Brittany Place when he says he was hurt. But there are other things that he used to make. It shows that the telephone from which these calls were made was used to originate a phone call from Elkhorn Village to Chicago, Illinois, or from Arlington Heights to Chicago. That's where the phone call originated. Now, he doesn't dispute that that's his cell phone, does he? No, not at all. How do we know that? Just what Justice Hoffman said. He said he knows it. I don't know it. What does origination mean in the cell phone? I can't even read my cell phone bill when I pay it. So, I mean, what does this mean? You said origination means physical presence. Right. Well, Your Honor, I will agree that there's no interpretation of what origination means. Okay, so we don't really know. We're just assuming. Well, but the petitioner then admitted that he had traveled a certain path to work. He traveled away from work to run an errand at lunch. He came back to Brittany Place. There's no doubt that you can rely, and the arbitrator could have relied, on the claimant's own testimony here. Correct. So you're suggesting that the claimant's testimony in and of itself, putting aside the cell phone records, supports the arbitrator's findings in regards to the timing. Absolutely. Well, isn't that sort of the key to this whole case? Because, I mean, I don't know that this case stands or falls on the cell phone records. When you came up, you alluded to there was other evidence totally aside from that. Yes, Your Honor. So can you hone in and tell us what that evidence is aside from the cell phone issue? Yes, Your Honor. Petitioner's accident was unwitnessed, so we only have his word or credit or not to take forward the fact that it happened the way he says it happened. His boss testified, though, that at 2 o'clock p.m. she released him for the day. So after that point, there was no reason for him to remain at Brittany Place. He was out of the course of his employment at 2 o'clock p.m. or thereabouts. He tried to explain that he was on a mission for Scott Walchek, who was the property manager, who does not have an office on site. Mr. Walchek would visit Brittany Place and other properties that he managed. He said that Mr. Walchek told him, pass off these flyers, check on these heating elements or boilers. There's some discrepancy over which heating element. But Mr. Walchek credibly testified it was Christmassy. My office closed at 1 o'clock off-site office. I was ill. I went home. I never saw Mr. Pekovic on that day. I gave him no flyers. So his course of employment is not extended by his mission he was on for Scott Walchek because there was no mission. There was no petition. So assuming that would have extended his employment if the claimant was believed versus Walchek, right? Well, I can't even make that assumption, Your Honor, because the credibility of the witnesses was determined by the arbitrator and affirmed by the commission. Well, I mean, this became a credibility issue at that point as to whether he had extended his employment. Correct. That if the claimant had been believed and not Walchek, then you wouldn't be here, right? Well, I'm not sure of that either, Your Honor, because there's more. Oh, there's more. There's more. Let's get to the more. Yes. It sounds like an infomercial. You get done with your arguments, but wait, there's more. Yes. Thank you. No, but if he had stayed to perform the heating checks, you know, Ava Ayers, who was the owner of EB Commercial, indicated that, you know, boiler checks are one way to indicate you've checked heating. And that's only done twice a week as was confirmed by Scott Walchek on Tuesdays and Thursdays generally. The Tuesday was the day before 12-23, and it has his initials, you know, Pekovic, next to each boiler check on that day. There is no law for Christmas Eve day. Ms. Ayers herself went to the site after she heard about Mr. Pekovic's injury and did her own boiler checks because that would have been the day after Christmas, a Friday rather than a Thursday because of the holiday. And she saw no corroborating evidence of the injury. So if we then go back to what Mr. Pekovic said happened in the stairwell, he said he had glasses on. He said he was carrying a cell phone. He said he had a step ladder because he was going to change light bulbs and exit signs. He was also holding light bulbs. But when he fell, and he said he left the step ladder behind, Ms. Ayers was there shortly afterwards, a day or two after. There was no evidence of broken glass. There was no evidence of the... Right, so the physical evidence wouldn't corroborate his verdict. Exactly. Who is Joanna Latosha? Joanna Latosha was the real estate agent who was brought in by Petitioner to testify. You know, the arbitrator found her to lack credibility, and not just because of the cell phone records, as Mr. Barish implied. She was a prior resident. She had his private business card. He called her at 1 o'clock on that day. So ostensibly there was a bias the arbitrator found because her testimony, if believed, would have substantially corroborated he was there at 4 o'clock. Well, she testified that she ran into him in the parking lot. She confirmed she didn't see him get her, but that that was between 3.35 and 3.40. She was very specific because she claimed she was showing an apartment at Christmas Eve at 4 o'clock. So Petitioner, though, testified that he fell at 3 o'clock, or maybe it was 3.30. But then we have the call from Natalia. So, location data aside, Natalia, at 3.43, calls from the Ukraine. And the Petitioner admitted, that's Natalia's number, and she called me then. The voicemail message that Mr. Bakovich left her, Ms. Ayers, was at 4.29. So his first utterance to the employer that he alleges he was hurt was via a voicemail message left in Polish that we had interpreted that indicated that Natalia heard the whole thing. I was talking to her when I found she heard the whole thing. Why do I even mention that? Because Natalia used to work for the respondent also. And that was later than what Wetosha said she'd seen him? Yes, not by a ton. But if he was hurt at 3.43 when he made a three-minute call to Natalia, calling him from the Ukraine, Wetosha can't see him ten minutes earlier injured. So, you know, there are a lot of little pieces here, Your Honors, that indicate that the manifest weight of the evidence indicates he failed to prove credibly that he sustained an injury while working for Breitbart. As we all know, it's up to the commission to judge credibly. There's another timeline that's involved here that he testified to. The calls that were placed between 2.37 and 3.11 that appear on the logs, he testified to those calls. And those calls indicate that they were originated from Arlington Heights, Mount Prospectus, Plains, and Glenview. He conceded that he wasn't at Brittany Place at the time those calls were made but was on his way to the hospital. Yes. Well, if he was on his way to the hospital at 2.37, he couldn't have been injured at 3 o'clock. And he didn't show up at the hospital until 5 p.m. I mean, putting all of this together, the arbitrator found the man just simply wasn't credible as to how he was injured. I agree. I agree. And it will be our request that you affirm the commission's decision in its entirety. Thank you, counsel. Counsel, you may reply. Oh, wait. Do you have a response? I didn't know what you wanted to allow us all to speak. I didn't ask for it. Everybody has 15 minutes. 15, 15, 5. You're it. You're it. I thought that our interest has been made by Brittany Place. I represent a very proud management. If we should cover all the cases, we absolutely should. Very good. I'm sorry, could you speak louder? I'm very good at direct society, but we need commercial. You're also a doctor. Very good. Thank you. You have 5 minutes on the floor. Thank you. Mr. Bohomish never admitted being away at the time of the incident. His testimony is that he was there. In terms of the cell phone data issue, and I realize I'm not Detective Rashke, I'm no expert, but it's Christmas Eve at 3 p.m. or 4 p.m. or sometime around then when this incident occurs, and I think we all know that there's a high volume of calls. What happens with them? I don't know. I'm not an expert. What would the commission do with this evidence absent the cell phone data? And I think none of us really know, which is why the circuit judge got to us. He threw out that data, but he felt that the manifest way of the evidence still supported the commission. What I think is very clear is we're really not sure what that commission would do, and the most appropriate thing to do would be to find out exactly how they lay the evidence. Are there factors that my opponents can cite? There's no question they are. Do I have a stronger case? Oh, my God, I have a disinterested witness contemplating hospital records and a phone call to an employer, and that phone call is approximately 45 minutes after the call from Natalia. What probably happened is Joanna Mitocha saw my client around 4 p.m., and at that point, Can I ask you a question? The voicemail that he left was translated as saying, Hi, boss, I have bad news. I fell down the effing down in the stairs, and almost my entire right hand is swollen. At that time, Natalia was calling me, and she heard this whole incident. Then he testified that Natalia called him when he was on his way to the hospital. How could she hear the whole thing if she didn't call until he was on the way to the hospital? I think the latter statement is after a five-part circus of cross-examination, and that makes no sense to me, and obviously, Your Honor, it makes no sense to you. I think his original statement to his boss that he was on the phone receiving a call from Natalia at the time is what happened. Wait a minute. It's not quite that far. He initially testified that he was in the maintenance office when he got the call from Natalia. Then he changed his story and said he got it when he was on the way to the hospital. He never testified that she heard him fall. That was in the message that he left for heirs.  My recollection is that on direct, he testified that while ascending the stairs, outside is when he received the call. And by the way, there was an evidentiary issue that I didn't mention in my first part of the argument. Photographs that he took. Counsel, that's like checking and raising a card game. You don't raise it in reply if you didn't raise it in the original argument. It's not fair. She doesn't get a chance to respond to you. I have nothing more to offer. Thank you, counsel. Thank you, counsel. All your arguments and adoption thereof. This matter will be taken under advisement and a written disposition shall issue. I'll be right back. Do you want to stand in brief recess? Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. .